

FILED
LODGED
ENTERED
RECEIVED

AUG 0 4 2023

BY
AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

RE

# IN THE FEDERAL COURT OF THE UNITED STATES

# FOR WESTERN WASHINGTON

CAUSE NUMBER...

2:23-cv-01177 DWC

**CHARLES PILLON**

   **PETITIONER**

**PETITION FOR VACATION OF UNLAWFUL EXCESSIVE CIVIL PENALTY.**

**VS.**

**THE STATE of WASHINGTON**

   **DEFENDANT.**

## AUTHORITY FOR THIS PETITION.

THIS PETITION IS SUBMITTED UNDER THE PROVISION(s) OF THE EIGHTH AMENDMENT TO THE CONSTITUTION *OF THE UNITED STATES*...AND OTHER CONSTITUTIONAL  PRECEPTS.

PILLON
V.
STATE

Avail.

NO SUMMONS W/S JEA-Z-Z034

Office of the County Clerk

5/10/22

**A   LEGAL FINANCIAL OBLIGATIONS** (Mail Money Order to County Clerk)

| CAUSE NUMBER | TOTAL SENTENCED AMT | INTEREST | | DATE OF LAST PAYMENT | |
|---|---|---|---|---|---|
| número de la | importe total sentenciado | | | fecha del último pago | |
| 161059836 | 3,903,600.00 | 574,192.49 | 7,325,550.98 | 3,403.03 | 02/06/2020 | 290.00 |

3,963,6.00    5,24,492.4   5,325,550    3,403

Actual balance may vary due to interest, subrot. and/or collection costs.



Due to budgetary constraints, billing frequency has been reduced to once every three months. An additional payment envelope for the third month's payment has been included for your convenience. IMPORTANT: You are still required to make a payment EVERY MONTH.

KEEP THIS COPY FOR YOUR RECORDS          Conserve esta copia para sus récords

2

⓵ TO REMOVE PANEL, TEAR PERFORATIONS ON BACK ⓵, REMOVE TAPE ON BACK AND FOLD HERE TO SEAL

PILLON, CHARLES EDWIN
PO BOX 2977
RENTON WA 98056

| CHECK IF NEW ADDRESS

**LEGAL FINANCIAL OBLIGATIONS**

TEAR THIS STUB ON THE DOTTED LINE AND RETURN WITH YOUR MONEY ORDER OR CASHIER'S CHECK ONLY MADE PAYABLE TO THE COUNTY CLERK, IN THE ENVELOPE PROVIDED.

DESPRENDA ESTE TALON EN LA LINEA DE PUNTOS Y DEVUELVA CON SU PAGO CON GIRO POSTAL O CHEQUE DE CAJA SOLAMENTE, MANDO AL SECRETARIA DEL CONDADA EN EL SOBRE ADJUNTO.

PAYMENT DUE BY
END OF THE MONTH
El pago vence al fin del mes

5/10/22

PILLON, CHARLES EDWIN

21911397

| CAUSE NO. | AMOUNT PAID |
|---|---|
| nauso no | importe pagado |
| 161059836 | |
| 3,403.03 | |
| | |
| | |
| | |
| **TOTAL DUE** | |
| | 3,403.03 |

Put address correction on return envelope.

20092

Ponga su direccion actual en el sobre que se incluye.

16939

**Envelope A: For first month's payment**

21911397

161059836

**KING COUNTY CLERK'S OFFICE**
**516 THIRD AVE**
**STE E-609**
**SEATTLE WA 98104-2363**

274A505-16939   20092

This PETITION has to do with a $4 MILLION DOLLAR Civil Penalty I suffered in King County Superior Court August 2018....at Seattle. The charge was of "littering" in King County...in a matter prosecuted by a State D.P.A. That Case # is 16-1-05983-6.

### __The Statute cited was a portion of RCW 70.__

*However*...This Statute provides clearly that it does not apply to actual landowners who may conduct innocent constructive (recycling for instance) activities on their own land...EVEN IF IT IS MESSY.

*IN A WORD...THIS WAS A WRONGFUL PROSECUTION. (See Ex # 1...Part of RCW 70.90)*

(XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX)

## RECENT SCOTUS RULINGS
## OF RELEVANT NATURE.

In the narrative (below) that follows the original Plea Declaration... I have reported the history of the misconduct of the State denying my 'EXCESSIVE CIVIL PENALTY" protections under THE EIGHTH AMENDMENT.

However...in addition... the SCOTUS just this past week delivered Rulings that bring even more emphasis to my claim(s) of legal abuse by the STATE. I explain them here because they

PILLON
v
STATE

~~Avail.~~        2.

further underline the destructive sort of Government abuse I am suffering.

The SCOTUS ruled that States cannot allow Govt Agencies to modify the law by *fiat or subterfuge* (my emphasis). College admission... for instance...cannot be dictated by racial concerns for a known minority. The Court made it clear that willy-nilly political attempts to create such social goals for a few cannot **be** concocted in an extra-judicial manner. The Law must be followed.

Likewise...The SCOTUS re-stated that THE POTUS cannot change fiscal rules by fiat when that matter is the continuing province of CONGRESS.

The Executive Branch...for instance... cannot unilaterally forgive the responsibility of a favored class...to cancel repayment of government funded loans. Thus...in this matter The COURT was unequivocal.

Finally...the SCOTUS found that an earlier decision...ROE v. WADE was erroneous; there again the Law was not followed... not withstanding subjective public wishes... because  ROE was established extra-judicially.

That issue is now under objective review at the individual State Legislatures where such contentious matters belong. Misbegotten conduct by agencies...ignoring CONSTITUTIONAL Requirement(s)... cannot be allowed to stand in any case.

### *SO SAYETH THE SCOTUS.*

~~Avail.~~  PILLOW
✓.
STATE

3

1
2
In my case...the STATE "CONCOCTED" a malicious fiction that over the years in my private recycling endeavors...I had fouled my land...and surrounding social and environmental features...including local waters...and so on.

3
4
This fiction begins casually enough in early Official Documents with "speculative" offerings about what may be in this container or that. In point of fact these "speculations" were reduced from the "size of a "FALCON"... to the size of a FLEA"...as EPA records establish.

5
The State took every opportunity to convince the TRIAL COURT...and the Public... that virtually everything on my land was _hazardous waste_...and initially convinced other agencies also.

6
7
8
E.G...virtually all of the official documentation produced by the State were replete with unproven claims. These were used at Trial: "hundreds of chemical containing containers and small cans as well"..."junk vehicles"..."demolition debris"..."fouled water'...and so on.

9
Relying on this cynical ploy... the State prosecuted me...which again was illegal because the chosen Statute (RCW Title 70) _barred that very sort of prosecution._

10
When a Federal Agency (the EPA)...then investigated my land AT THE BEHEST OF THE STATE; THE EPA ESSENTIALLY DISPROVED THOSE STATE FICTIONs...BUT THE STATE STILL CYNICALLY

Avail. PILLON
v
STATE

4

IGNORED AN EARLIER SELF-IMPOSED COMMITMENT TO CORRECT THIS SPECULATIVE CIVIL PENALTY **...if such was the investigatory result.** And...it was!

The Trial Court still refuses to enforce that earlier provision in spite of that STATE Commitment which that Court had actually approved- in the Penalty Document.

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

Thus the destruction of my EIGHTH AMENDMENT right(s) is ongoing...as the demand for payment has been made continuously...(See exhibit # 2). Additional Usurious Interest has upped the amount to over $5.5 million dollars. I have again notified the State of Washington of my refusal to pay any further on this malicious Penalty..*!*

## MY PERSONNEL COLLECTION.

This <u>"HAZARDOUS WASTE"</u> *included* collections of CLASSIC CARS...MILITARIA... MARITIME ARTIFACTS...CONSTRUCTION EQUIPMENT...FARM EQUIPMENT...AND SO ON. I have collected such property over 30-plus years.

My land is a secluded 10 acre tract and is barely visible from neighbors' vistas...nor nearby roadways. Such collections are not uncommon in rural areas... and attract viewers from here and there on their country outings.

## TRIAL EVENT.

This matter went to trial circa April 17th of 2017. I was wrongfully convicted under SEC. 70.95 of the RCW. This conviction carries a $5 thousand dollar punishment for a person so convicted. ***I have long-since paid that Fine to keep the "waters calm"...while this matter is resolved.***

However... Section 70 RCW provides an additional "CIVIL PENALTY" ***if the State is forced to clean-up some massive) littered site.*** There is a "formula" that provides a means to calculate the CIVIL PENALTY. (See Exhibit # 3).

AGAIN... ***THIS CIVIL PENALTY*** APPLIES *ONLY* AFTER ***SOME STATE CONDUCTED CLEAN-UP... IS ACTUALLY DONE.***

It is important to include here that both the EPA and the State have very highly promoted "OWNER CLEANUP PROGRAMS"... WHICH I WAS DENIED. This occurred even though I had demonstrated to both agencies that I had the equipment and experience to clean-up what little work there was to do.

When finally the EPA realized that there was no need for major excavations...it was too late to allow me to simply proceed according to those programs. So the stage was set for the plunder that the TRIAL COURT imposed at the STATE'S BEHEST.

## PARTICIPANTS.

Pillon
v.
~~Avail~~ STATE

6

1 | The STATE had enlisted several agencies to dramatize this operation. ***All ultimately declined*** to do any so-called cleanup.

2 | The State brought along the WA. State Patrol...WA. State Dept. of Ecology...the King County Solid Waste Division...and the State Dept. of Solid Waste...and the U.S. EPA.

3 | In spite of all the earlier fictions...the actual results of these Agencies investigation were as follows:

4 | 1...THE STATE PATROL inspected all my vehicle collection;... WSP REMOVED NO VEHICLES OR OTHER PROPERTY...acknowledging that this was a legitimate collection.

5 | 2...THE STATE DEPARTMENT OF ECOLOGY TESTED WATER SAMPLES AND DECLARED THEM ACCEPTABLE. NO WATER WAS REMOVED from anywhere on my land. (SEE EX 4...***WATER QUALITY DOCUMENT)...and also 18-24755-6 KNT.***

6 |

7 | 3...THE KING COUNTY SOLID WASTE DIVISION INSPECTED AND...REMOVED NO MATERIAL WHATSOEVER.

8 | 4...AND FINALLY...THE EPA. THEIR WORK WAS IDENTIFIED AS AN "INVESTIGATION". AFTER WHICH " INVESTIGATION"... THE EPA DECLINED TO EVER RETURN TO PERFORM ANY CLEAN UP.

9 |

10 | AT THE OUTSET...THE STATE LIMITED THE PENALTY CALCULATION TO THE SO-CALLED "DEBRIS FIELD" The State claimed that the rest of my land was "so polluted"... It was not possible "to investigate it all". Because the "DEBRIS FIELD" WAS

Pillon
v
STATE

~~Avail~~

7

THE ONLY MEASURABLE SITE ON MY LAND THAT COULD NOT BE VISUALLY INVESTIGATED...it was a compost pile 20plus feet deep. IT HAD TO BE EXCAVATED.

AND...IT WAS THE LAST...LARGEST AREA WHERE STATE COULD PROP UP THE FICTIONS THEY HAD USED TO CONVINCE THE TRIAL COURT OF GROSS HAZARDS BURIED ON MY LAND.

The EPA SOON DID THE NECESSARY EXCAVATIONS ON This "DEBRIS FIELD"...AND DECLARED THAT "THE DEBRIS' WAS IN FACT HARMLESS COMPOSTED HUMUS...*(See Ex # 3 again) )*.

*COMPOST/HUMUS CULTIVATION IS PROMOTED BY THE EPA ITSELF...AND THE STATE AS WELL... AS A VERY ECOLOGICALY BENEFICIAL PROCESS. (See EPA document attesting to the Environmental quality and uses of COMPOST...(See Ex # 5).*

## EPA RESULTS ON THE DEBRIS FIELD

The EPA did numerous excavations...to a depth of 27 feet in some... and recorded that IT FOUND NO HAZARDOUS MATERIAL IN "THE DEBRIS FIELD"...THUS *"NO FURTHER ACTION WAS NEEDED THERE* This finding conclusively negated any potential *lawful* additional Civil Penalty based on that area. (See Ex #7...DECLARATION OF JARROD WOOD).

## EPA MOVES ON.

In the next grid area of my land...the EPA had earlier noted that the surface soil in and around my out-buildings appeared to

Avail. Pillon
v
STATE

9

have been stained with oil or other chemicals. *The EPA had noted that the buildings themselves might have to be demolished to "clean-up the soil under and around them".*

However... when the EPA did initial soil-sampling and testing on the grid/area at this site...they again closed their modest excavations and acknowledged there was no significant pollution there. (See Declaration of RAY COX...Exhibit # 8)

Three other sites were similarly treated...with similar negative results. The EPA did remove a few truckloads of dirt from the last easterly area of my land...as a precaution after preliminary on site testing. The EPA did not provide me with clear follow-up evidence here...(as earlier ordered by this very Federal Court)...so I have assumed they found no need to.

So...after 30 plus years of surface recycling here... the extent of EPA testing/ investigation of suspect sites...***was less than 2% of my land disturbed during "the (entire)EPA investigation".***

## WATER QUALITY ISSUE.

The question of harm to surface-water (and groundwater as well) was also resolved. The STATE Dept of Ecology sampled my Drainage System at the time of the original "search"...and came back within three weeks with a report that indicated that the water was *"NON-HAZARDOUS WASTE-WATER"*... and the drainage needed no further action by that agency. This was confirmed in Cs # 18-24755-1 King County Superior Court.

PiLLON ✓
STATE

Agri.

9.

**1** In spite of the exculpatory results of the water-tests...the STATE still demanded *that the EPA drill test-wells* down to ground-water in eight sites on my land. All at my expense.

**2** All to no avail. The wells were essentially dry-holes and the only water removed was sent to a LAB in UTAH. Those reports were likewise harmless. (See Ex 4)

**3** Thus in less that twenty days...an exercise that was originally estimated to take three-to-six months... lasted about two weeks.

## MOTION TO VACATE PENALTY

**5** It was now in the first days of 2019 and I waited for a semblance of a Final Report from the EPA; in two months or so...it came back. It reflected the real report of the EPA; EXCULPATORY.

**6** Then...using all the accurate exculpatory EPA evidence now available...I filed a Motion to Vacate the CIVIL PENALTY with the Trial Court. (See Exhibit #9 ...Motion to Vacate.)

**7** The Trial Court refused even to consider the exculpatory evidence I submitted. This refusal was disturbing to say the minimum. *It was this Court* ...after all... that had assigned the *EPA to conduct the investigation*...and now refused to consider the very exculpatory evidence it had ordered collection of.

## THE INCREDIBLE CIVIL PENALTY.

PILLON
v
STATE

Avail

10

The very magnitude of this Civil Penalty is an insult to begin with; to the LAW...and our COURTS. Any Superior Court Judge or seasoned Prosecutor would seemingly be well enough versed in Eighth Amendment Law to know the cynical error in this Penalty. There was something else at work here.

All this alone...coupled with the gross nature of the  Penalty itself...warrants summary Vacation of this State abomination of Law.

## CONCLUSIONS

### THE FACTS ARE CLEAR.

The State of Wa. set the stage to extort money from me with fictional representations that my land was grossly polluted. The State prosecuted me...the Statute used was RCW 70.90. *I PAID A $5000 FINE.*

Then the State unlawfully levied this *$ multi-million dollar additional  penalty...*for a large Compost Pile on my land. The Compost Pile *had been previously reported by the EPA*... *as not hazardous.  See Ex 3 again)*

THUS... NO MATERIAL WAS REMOVED THERE...BY ANY PARTY.

### THE STATE STILL REFUSED TO RECONSIDER

The State has cynically continued to inflict this injury on my family...in addition to other harm. The State has raided our bank account for more than $100,000 so far!

Avail Pillon
V.
C-ATE

11.

1  There are plenty of cases more egregious than mine...but I believe this case is well above THE EIGHTH AMENDMENT THRESHOLD for purposes of my ***Motion to Vacate***.. There is one

2  case I will here refer to that stands out for comparison.

3  ### ***TIMBS V. INDIANA...***

4  *HERE...THE COURT* VACATED A SIMILAR EXCESSIVE CIVIL PENALTY. THE DEFENDANT **"TIMBS)... Actually  ADMITTED** AN ILLEGAL TRANSACTION OF DRUGS TO AN UNDERCOVER POLICE OFFICER AND DELIVERED THE DRUGS IN HIS AUTOMOBILE.

5  THE AUTOMOBILE WAS SEIZED AS PART OF *THE POLICE ACTION.* *TIMBS WAS SENTENCED TO THE STATURY MAXIMUM*

6  *PENALTY...SOME $10,000. THE VEHICLE WAS NOT RETURNED.*

"*TIMBS*" APPEALED AND THE QUESTION WAS WHETHER OR NOT THE SEIZURE (A CIVIL PENALTY IN EFFECT) WAS EXCESSIVE

7  UNDER THE EIGHTH AMENDMENT. THE CASE ENDED UP IN THE UNITED STATES SUPREME COURT.

8  THERE THE COURT HELD THAT THE SEIZURE (PENALTY) ***WAS*** ***EXCESSIVE***. THE JUSTICES OPINED THAT THE ORIGINAL CASH

9  PUNISHMENT *MET THE NEEDS OF SOCIETY FOR JUSTICE SAKE*.

AND...FURTHER THAT THE VALUE OF THE VEHICLE FAR EXCEEDED ANY LEGITIMACY THE STATE COULD ESTABLISH FOR

10  THE SEIZURE...SINCE THE STATUTORY FINE HAD BEEN PAID.

~~Avail.~~   PILLON
                   V
              STATE          12

1  (See Ex #10...Timbs)

2  The State provided no basis... **_other than SPECULATION_** ...FOR INFLICTING THIS OUTAGEOUS ADDITIONAL PENALTY.

3  In my case..._"TIMBS"_ clearly applies.  Here the STATE had falsely convicted me of "LITTERING" and I had been forced to pay the Statutory cash Penalty...$5,000. The State then embarked on a campaign to convince the Trial Court that I had also buried every manner of hazardous "LITTER" up here.

4  The STATE went on to prejudice the Trial Court and the U.S. EPA that I had polluted my land and buried hazardous _"LITTER"_ anywhere I cared to... **_All on speculation_**.

5   Stepping off from there...<u>before any cleanup had even been planned for my land</u>...THE STATE CONCOCTED THIS EGREGIOUS UNLAWFUL CIVIL PENALTY...based on willful avoidance of this Section of the Statute...and subversion the EPA evidence.

6  

7  ## THERE IS NO PROVISION FOR SPECULATION

## IN THE EIGHTH AMENDMENT.

8  _It defies common knowledge and awareness of the fact that both the Trial Court Judge and these State lawyers Seem to have missed study in Eighth Amendment Law... in the run-up to their admission to THE BAR._

9  

    _As I have noted before...something else was up here._

10

Availl.    PilloN

        v.

    STATE              13

*Again...the projected "EPA-CLEAN UP"... originally two or three months... did not last more than 10 SUBDUED DAYS or so. The EPA essentially INVESTIGATED AND debunked all the fiction(s) the STATE had generated to convince the Public...the Media...* **the TRIAL COURT...AND THE EPA... OF MY "HAZARDOUS" RECYCLING ACTIVITY). EPA NEVER RETURNED AFTER THEIR "INVESTIGATION...NOTING THIS FACT IN THEIR REPORTING.**

*Subsequently I made every attempt to make STATE officials aware of this injustice. There is ample email exchange and Court record to illustrate this; all to no avail.*

*This left me with no other recourse than this last MOTION TO VACATE...RELYING ON MY EIGHTH AMENDMENT PROTECTION.*

## CONFIRMATORY FACTS.

I have included...in this narrative... the records (including relevant Exhibits) of just some of the related actions of those parties... the Court and the State itself. I assume the State will contest this Motion and offer more "bogus criticism" of me in an effort at deflection of the facts. So I have added emphasis to facts here to alert the State that I am prepared: ...

**In addition I have included un-narrated Exhibits 12 to 17 which are testimonials (some dated)...to my extensive work over time in Community Safety efforts.**

## EXHIBITS FROM THE NARRATIVE.

**1...Portion of RCW 70.9X.**

Pillow
v
STATE

14

2...Recent State billing.

3...Order setting Restitution.

4...Water Quality Form.

5...EPA Compost Document.

6..No Exhibit 6.

7...Declaration of friend Jarrod Wood.

8...Declaration of friend Raymond Cox.

9...Motion to Vacate Civil Penalty in 2019.  (Denied).

10...(TIMBS).

11...Aerial View of property.


## UN-NARRATED EXHIBITS.

12...Neighbor Clint Cave.

13...Mr. David Spohr.

14...Neighbor Kenny O.

15...Mr Denis Law.

16...Son Andy Pillon.

17...Neighbor Douglas Bandelin.

1
2
3
4
5
6
7
8
9
10

Pillon
Avail.    v
STATE                    15

# RELIEF REQUESTED

I HEREBY REQUEST THAT THIS UNLAWFULL CIVIL PENALTY BE VACATED...AND ALL SEIZURES OF MY MONIES REGARDING THIS MATTER BE RETURNED TO ME WITH HASTE. THAT AMOUNT EXCEEDS $100,000 AS STATE RECORDS WILL SHOW.

THE PETTY TYRANNY DEMONSTRATED TO THIS POINT MAKES IT ONLY TOO CLEAR THAT SOME UNSTATED MOTIVE EXISTS WITHIN THE RANKS OF SOME STATE OFFICERS.

I FURTHER REQUEST THAT THIS COURT DECIDE IF RENUMERATION... FOR MY TIME AND EXPENDITURES... SHOULD BE ADDED TO THIS COMPENSATION

FURTHER...THAT THE STATE BE BARRED FROM ANY MORE INTERFERENCE IN MY LIFE BASED UPON ANY FACET OF THIS PARTICULAR LAWLESS MATTER.

I HEREBY CERTIFY AND AFFIRM...UNDER PENALTY OF PERJURY...UNDER THE LAWS OF THE STATE OF WA... THAT ALL FACTS AND EXHIBITS RELATED IN THIS MOTION... ARE TRUE AND CORRECT TO THE BEST OF MY ABILITY.

AT RENTON WASHINGTON...JUNE 29TH 2023.

CHUCK PILLON.......... 206 383-5115.

Avail.

P.O. BOX 2997 RENTON 98056

16

PDF    **RCW 70A.200.060**          *EX #1*

## Littering prohibited—Penalties—Litter cleanup restitution payment.

(1) It is a violation of this section to abandon a junk vehicle upon any property. In addition, no person shall throw, drop, deposit, discard, or otherwise dispose of litter upon any public property in the state or upon private property in this state not owned by him or her or in the waters of this state whether from a vehicle or otherwise including but not limited to any public highway, public park, beach, campground, forestland, recreational area, trailer park, highway, road, street, or alley except:

(a) When the property is designated by the state or its agencies or political subdivisions for the disposal of garbage and refuse, and the person is authorized to use such property for that purpose;

(b) Into a litter receptacle in a manner that will prevent litter from being carried away or deposited by the elements upon any part of the private or public property or waters.

(2)(a) Except as provided in subsection (4) of this section, it is a class 3 civil infraction as provided in RCW **7.80.120** for a person to litter in an amount less than or equal to one cubic foot.

(b) It is a misdemeanor for a person to litter in an amount greater than one cubic foot but less than one cubic yard. The person shall also pay a litter cleanup restitution payment equal to twice the actual cost of cleanup, or fifty dollars per cubic foot of litter, whichever is greater. The court shall distribute one-half of the restitution payment to the landowner and one-half of the restitution payment to the law enforcement agency investigating the incident. The court may, in addition to or in lieu of part or all of the cleanup restitution payment, order the person to pick up and remove litter from the property, with prior permission of the legal owner or, in the case of public property, of the agency managing the property. The court may suspend or modify the litter cleanup restitution payment for a first-time offender under this section, if the person cleans up and properly disposes of the litter.

(c) It is a gross misdemeanor for a person to litter in an amount of one cubic yard or more. The person shall also pay a litter cleanup restitution payment equal to twice the actual cost of cleanup, or one hundred dollars per cubic foot of litter, whichever is greater. The court shall distribute one-half of the restitution payment to the landowner and one-half of the restitution payment to the law enforcement agency investigating the incident. The court may, in addition to or in lieu of part or all of the cleanup restitution payment, order the person to pick up and remove litter from the property, with prior permission of the legal owner or, in the case of public property, of the agency managing the property. The court may suspend or modify the litter cleanup restitution payment for a first-time offender under this section, if the person cleans up and properly disposes of the litter.

(d) If a junk vehicle is abandoned in violation of this section, RCW **46.55.230** governs the vehicle's removal, disposal, and sale, and the penalties that may be imposed against the person who abandoned the vehicle.

(3) If the violation occurs in a state park, the court shall, in addition to any other penalties assessed, order the person to perform twenty-four hours of community restitution in the state park where the violation occurred if the state park has stated an intent to participate as provided in RCW **79A.05.050**.

(4) It is a class 1 civil infraction as provided in RCW **7.80.120** for a person to discard, in violation of this section, potentially dangerous litter in any amount.

[ 2003 c 337 § 3; 2002 c 175 § 45; 2001 c 139 § 1; 2000 c 154 § 2; 1997 c 159 § 1; 1996 c 263 § 1; 1993 c 292 § 1; 1983 c 277 § 1; 1979 ex.s. c 39 § 1; 1971 ex.s. c 307 § 6. Formerly RCW **70.93.060**.]

## NOTES:

NOV 30 2018
X-3-20-2-122874   STATE ORDER OF NOV 2018



# FILED
### KING COUNTY, WASHINGTON

NOV 30 2018

SUPERIOR COURT CLERK
BY Irina Poliansky
DEPUTY

X    #3-0

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## STATE OF WASHINGTON
## KING COUNTY SUPERIOR COURT

THE STATE OF WASHINGTON,

                Plaintiff,

v.

CHARLES EDWIN PILLON

                Defendant.

NO. 16-1-05983-6 KNT

ORDER SETTING LITTER
CLEANUP RESTITUTION
PAYMENT

The Court, having considered the arguments and materials submitted by the parties and being fully advised finds:

1) The defendant was convicted of Unlawful Dumping of Solid Waste Without a Permit, a violation of RCW 70.95.240.

2) This conviction carries with it the imposition of a Litter Cleanup Restitution Payment.

3) The Court sets the Litter Cleanup Restitution Payment in this matter at $3,888,000.⁰⁰

4) The Litter Cleanup Restitution Payment is payable in full to:
Public Health – Seattle & King County
Attn: H. Alex Yoon, CPA, CFO
401 5th Avenue, Suite 1300
Seattle, WA 98104

ORDER SETTING LITTER CLEANUP
RESTITUTION PAYMENT



14

NOV 16 2018

EX 3 -1

X-1 20-2-12287-4 STATE MEMO NOV 16 2018

CS# 19-CV-00710

**STATE OF WASHINGTON**
**KING COUNTY SUPERIOR COURT**

THE STATE OF WASHINGTON,

                    Plaintiff,

          v.

CHARLES EDWIN PILLON ,

                    Defendant.

NO. 16-1-05983-6 KNT

STATE'S MEMORANDUM
REGARDING LITTER CLEANUP
RESTITUTION PAYMENT

## I.     STATEMENT OF THE CASE

The defendant, Charles Edwin Pillon, was convicted of two felony offenses and a single misdemeanor count of Unlawful Dumping of Solid Waste Without a Permit, a violation of RCW 70.95.240. This latter offense carries with it a mandatory litter cleanup restitution payment. This payment "must be the greater of twice the actual cost of removing and properly disposing of the litter, or one hundred dollars per cubic foot of litter." RCW 70.95.240(3)(c)(ii). A mechanical application of this language would produce an absurd cleanup payment figure under the circumstances: $55,841,988. The State, however, proposes that the court calculate the cleanup payment using the volume of solid waste that Mr. Pillon stipulated to dumping. Using that volume, the state asks the court to impose a payment of $3,888,000, while noting the potential need to revise that request once actual cleanup cost estimates are available.

STATE'S MEMORANDUM REGARDING            1
LITTER CLEANUP RESTITUTION PAYMENT

ATTORNEY GENERAL'S OFFICE
Counsel for Environmental Protection Unit
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 326-5494

EX 3.-2

## II.    LITTER CLEANUP RESTITUTION PAYMENT CALCULATIONS

State law provides two alternative methods for calculating the Litter Cleanup Restitution Payment – one based upon the actual cost of cleanup and the other based upon the volume of illegally disposed solid waste. The mandatory fine must be the greater of the two calculation methods. RCW 70.95.240(3)(c)(ii) ("This payment must be the greater of twice the actual cost of removing and properly disposing of the litter, or one hundred dollars per cubic foot of litter").

The United States Environmental Protection Agency is in the process of accessing the Pillon property to complete a site investigation. This work involves designing a cleanup plan, obtaining soil and water samples to help define the extent of contamination, and planning for removal of any hazardous materials. Once this initial step is complete and the scope of the contamination is better understood, a realistic cost of cleanup can be established. The Litter Cleanup Restitution Payment based upon actual cleanup costs would then be twice that cost estimate. Because the EPA has not yet completed its site investigation, we have insufficient information at this time to calculate the Payment using this method. EPA expects to have this information in the coming weeks.

The second method identified in RCW 70.95.240(3)(c)(ii) calculates the Payment using the total volume of solid waste illegally disposed at the site. The Washington State Patrol flew a drone over the entire property, measuring the precise elevation of every pile of solid waste on site. Using this data, the Patrol created a 3D map of the Pillon property. The data collected by the drone in the form of high resolution photographs was then entered into a computer program called Pix4D. This software, via a "stitching together" of numerous photographs in a process called photogrammetry, can be utilized to obtain accurate volume calculations of materials piled on the ground. Large mining corporations rely upon this program and technique for purposes of inventory management of gravel stockpiles. *See* www.pix4d.com and Exhibit A - Report of Investigation of Detective Brody Ford.

STATE'S MEMORANDUM REGARDING
LITTER CLEANUP RESTITUTION PAYMENT

2

ATTORNEY GENERAL'S OFFICE
Counsel for Environmental Protection Unit
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 326-5494

2O

EX 3-3

1  once that amount is determined. Second, the statutory formula based on the total quantity of

2  illegally disposed solid waste present in the large debris pile on the property, or $55,841,988.

3  Third, the statutory formula based on the quantity of illegally disposed solid waste as stipulated

4  by Mr. Pillon, or $3,888,000.

### III.  CONCLUSION

6      The state seeks a litter cleanup restitution payment consistent with state law, factually

7  supported by the observed conditions of the site, and reasonable in light of the circumstances.

8  The state recognizes that a mechanical application of RCW 70.95.235(3)(c)(ii) would result in

9  an absurdly large payment that would not be realistic for Mr. Pillon to pay, and would be out of

10  proportion to the actual needs of the site. Thus, the state asks the court to enter at this time a

11  Litter Cleanup Restitution Payment of $3,888,000 payable to Public Health – Seattle and King

12  County, Environmental Health Fund. This figure is calculated based upon volume of solid waste

13  Mr. Pillon stipulated to have dumped on the property during the charging timeframe. Should

14  the EPA estimates of actual cleanup costs warrant revisiting this figure, the state will re-note

15  this hearing.

*ON THE DEBRIS FIELD*

16      DATED this 16th day of November, 2018.

18  ROBERT W. FERGUSON
    Attorney General

21  SCOTT A. MARLOW, WSBA #25987
22  Assistant Attorney General
    Attorney for the State of Washington

23  ⊗ THIS STIPULATION IS MISTATED AS AN ADMISSION
    THAT I DUMPED "SOLID WASTE" ON THE SO
24  CALLED "DEBRIS FIELD"... POINT OF FACT
25  I STATED THAT IT WAS COMPOST MATERIAL... BUT
    THE STATE CHANGED THIS TO FIT THEIR
26  AGENDA. THE EPA PROVED IT IS COMPOST
    WEEKS LATER BUT THE STATE IGNOR THIS.

STATE'S MEMORANDUM REGARDING              ATTORNEY GENERAL'S OFFICE
LITTER CLEANUP RESTITUTION PAYMENT        Counsel for Environmental Protection Unit
                                          800 Fifth Avenue, Suite 2000
                                          Seattle, WA 98104-3188
                                          (206) 326-5494

EX 3-4

9 at 10.) Soil samples from the eight test pits showed only modest levels of contamination—the

2  EPA has concluded that further action at these pits is not required. (*Id.* at 9–10; *see also* Dkt. No.

3  9-20.) However, apart from the eight test pits, other soil samples in the Landfill Area showed

4  levels of petroleum contamination in a range that warrants further action. (Dkt. Nos. 9 at 11–12,

5  9-20 at 20.) Defendant appears to use the Workshop Area to work on vehicles. (Dkt. No. 9 at

6  10.) Soil samples from this area showed elevated concentrations of lead, cadmium, and

7  hydrocarbons in the motor and diesel ranges. (Dkt. Nos. 9 at 9–10, 9-20 at 16.) The presence of

8  the oil and diesel contamination requires further action. (Dkt. No. 9 at 9–10.) Soil sampling in

9  the Bus Area was similar to soil sampling in the Workshop Area. (*Id.*; Dkt. No. 9-20 at 20.)

10  Finally, surface water samples were taken during this 30-day period. (Dkt. No. 9 at 11–12.)

11  Nearly all of the samples showed concentrations of petroleum that warrant further action. (*Id.*;

12  Dkt. No. 9-20 at 25.)

13      Even after that 30-day clean-up and testing period, contaminated soil remains and the

14  EPA is unsure about whether there is any groundwater contamination. (*Id.* at 12–13; *see also*

15  Dkt. Nos. 9-19, 9-20.) The EPA asserts that, to address the contamination and threats at the

16  Property, the following actions need to be taken: removal of soils known to be contaminated;

17  testing of soils in the areas of contamination to ensure that all soils contaminated above action

18  levels have been removed; and installation of groundwater monitoring wells to monitor

19  groundwater that has been, or may become, contaminated. (Dkt. No. 9 at 13.) The Government

20  intends to only be present on Defendant's property for around two months. (Dkt. No. 8 at 16.)

21  Because of the EPA's designation of specific zones of likely contamination and because of the

22  short time period of the Government's presence, its remedial plan is tailored. (Dkt. No. 9 at 13;

23  *see also* Dkt. No. 9-20.) The Government brings the present motion for summary judgment,

24  seeking access to the Property so that it can perform these additional remedial actions. (Dkt. No.

25  8.)    THIS PAGE IS REPLETE WITH "FUZZY" OBSERVATIONS

26  //    ABOUT WHAT MAY BE ON MY LAND, FINAL EPA
        INVESTIGATION FOUND NO SIGNIFICANT CONTAMINATION
        AND EPA DEPART WITHOUT ANY MORE ACTION

ORDER
C18-1845-JCC
PAGE - 3        22    SEE ⊗ AT THE TOP
                           OF THIS PAGE

EX 3-5

1     The state took steps to ensure that the volume calculations were minimized to any extent

2 possible to obtain a conservative fill volume. These steps included limiting the volume

3 calculation to the single large debris pile and not attempting to include the numerous vehicles,

4 boats and smaller piles scattered throughout the property. This pile is denoted in orange in the

5 attached topographical representation of the property. See Exhibit D – Topographical map of

6 the Pillon property. The volume of solid waste present in the large debris pile is a minimum of

7 558,419.88 cubic feet. See Exhibit A – Report of Investigation of Detective Brody Ford.

8 Detective Ford will also be present at the hearing and prepared to testify to his calculations, the

9 use of the drone, and the Pix4D program should the Court want additional information. The

10 Litter Cleanup Restitution Payment based upon this volume would be $55,841,988.

11     Although this calculation is derived directly from state law and based upon a

12 conservative volume figure, the state recognizes that it would be absurd to order Mr. Pillon to

13 pay over $55 million under these circumstances. The court has the option to limit the calculation

14 of Mr. Pillon's illegally disposed solid waste to only the volume that Mr. Pillon stipulated to at

15 trial, rather than the full volume observed on site. Mr. Pillon's stipulation covers only certain

16 materials, and only waste that was placed on site during the twelve-month period charged in

17 this criminal case. Thus, this method offers the Court a more limited volume on which to base

18 the statutory calculation.

19     Specifically, Stipulation #6 details that Mr. Pillon brought 120 cubic yards of solid waste

20 onto the property each month during the 12 month charging period relevant to Count III (See

21 STIPULATIONS OF THE PARTIES REGARDING AGREED FACTS, TESTIMONY, AND

22 EVIDENCE). Utilizing this figure to calculate the total volume yields a figure of 3,888 cubic

23 feet. Applying the Litter Cleanup Restitution Payment formula in RCW 70.95.235(3)(c)(ii), this

24 volume produces a payment of $3,888,000.

25     Consequently, the court has at hand three options to consider in calculating the Litter

26 Cleanup Restitution Payment: First, twice the actual cleanup cost as estimated by U.S. EPA,

STATE'S MEMORANDUM REGARDING        3
LITTER CLEANUP RESTITUTION PAYMENT

ATTORNEY GENERAL'S OFFICE
Counsel for Environmental Protection Unit
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 326-5494

122637/

EX 3 – 6

1      5) Should the cost of actual cleanup, once determined, necessitate revising the Litter

2      Cleanup Restitution Payment the State shall re-note this matter.

3

4      DONE IN OPEN COURT this 30th day of November, 2018.

5

6                       Judge Julia Garratt

7

8

9  Presented by:

10  ROBERT FERGUSON                  DAN SATTERBERG
    Attorney General                    King County Prosecuting Attorney

11

12  By:                                    PATRICK H. HINDS, WSBA #34049
    SCOTT A. MARLOW, WSBA #25987     Senior Deputy Prosecuting Attorney

13      Assistant Attorney General,

14  Attorneys for the Plaintiff, State of Washington

15

16

17                             Approved as to form:

18                             Present but

19                             Declined to Sign
                           CHARLES E. PILLON
                           Defendant, *Pro Se*

20

21  THE NARRATIVE ⊗ ⊗ ON LINE 1 ABOVE

22  PROVES THAT THE STATE WAS COMMITED TO

23  REVISING THE PENALTY WHEN THE EPA

24  FINISHED THEIR "INVESTIGATION"

25  THE STATE NEVER HONORED THIS

26  COMMITMENT



*X 3 # -7*        *1ZZ87-4 EPA EVIDENCE.*

1 "Government") conducted a one-day sampling event at the request of the Washington State

2 Attorney General's Office. (*Id.* at 3.) The EPA was tasked with identifying and sampling

3 containers potentially containing hazardous substances and areas of potentially contaminated

4 soil. (*Id.* at 3.) The EPA observed hundreds of unmarked and mislabeled containers that appeared

5 to be leaking. (*Id.*) Results for every surface soil samples exceeded cleanup levels for cadmium,

6 chromium, benzo(a)pyrene, total toxicity equivalent concentration ("TTEC"), and/or motor oil

7 range organics. (*Id.* at 3.)

8       In July 2018, the Washington Department of Ecology asked the EPA to perform an

9 emergency removal action at the Property. (*Id.* at 4; Dkt. No. 9-6.) The EPA visited the Property

10 to evaluate the extent of the contamination. (Dkt. No. 9 at 5.) The EPA obtained consent from

11 Defendant to walk around and observe the Property. (*Id.*) During this walk-through, the EPA

12 observed approximately 250 containers, some of which evidenced leaking. (*Id.*) After the July

13 2018 visit, Defendant was reluctant to grant the EPA access to the Property. (Dkt. Nos. 9 at 6–7,

14 9-7–9-17.) Defendant has since sent a series of emails to the EPA outlining his objections to its

15 involvement on the Property. (Dkt. Nos. 9-7–9-17.) In October 2018, the EPA emailed

16 Defendant to request access to the Property, to which Defendant responded with multiple emails

17 indicating his refusal to consent. (Dkt. No. 9-13–9-17.) Thereafter, the EPA applied to the court

18 for an administrative warrant to access and clean-up the Property. *United States v. May Creek*

19 *Landfill Site*, Case No. C18-0114-JPD, Dkt. No. 1 (W.D. Wash. 2018).

20       In November 2018, Judge Donohue granted the EPA a 30-day administrative warrant.

21 *United States v. May Creek Landfill Site*, Case No. C18-0114-JPD, Dkt. No. 4. After gaining

22 access to the Property with that warrant, the EPA took samples, conducted further inspections of

23 the premises, and removed and processed over 1,600 containers of chemicals. (Dkt. No. 9 at 8.)

24 In the process of sampling the soil, the EPA identified three different areas on the Property

25 where soil contamination seemed most likely—the Landfill Area, the Workshop Area, and the

26 Bus Area. (Dkt. Nos. 9 at 8, 9-19.) In the Landfill Area, eight test pits were excavated. (Dkt. No.

*X NOTE. ALL THESE "TEST PITS" WERE CLOSED "WITHOUT FURTHER ACTION" (B) PER EPA RECORD*

ORDER
C18-1845-JCC
PAGE - 2

*25*

# NON-HAZARDOUS WASTE MANIFEST

DI 2103852148-002

Please print or type    (Form designed for use on elite (12 pitch) typewriter)

| NON-HAZARDOUS WASTE MANIFEST | 1. Generator's US EPA ID No.  WAH000056055 | Manifest Document No. NH852148 | 2. Page 1 of |
|---|---|---|---|

**3. Generator's Name and Mailing Address**
May Creek Landfill
15763 SE Renton Issaquah Rd SE
Renton WA 98059

Site Address : SAME

**4. Generator's Phone ( (307) 247-4107**

| 5. Transporter 1 Company Name  Clean Harbors Environmental Services, Inc. | 6. | US EPA ID Number  MAD039322250 | A. State Transporter's ID |
|---|---|---|---|
| | | | B. Transporter 1 Phone  (701)792-5800 |
| 7. Transporter 2 Company Name  Tri State North & H Co | 8. | US EPA ID Number  MOD985035998 | C. State Transporter's ID |
| | | | D. Transporter 2 Phone |
| 9. Designated Facility Name and Site Address  Clean Harbors Grassy Mountain LLC  5 Miles East 7 Miles North of Knolls  Grantsville, UT 84029  NHG52148 | 10. | US EPA ID Number  UTD991301748 | E. State Facility's ID |
| | | | F. Facility's Phone  (435) 884-8900 |

| 11. WASTE DESCRIPTION | Containers | | 13. Total Quantity | 14. Unit Wt./Vol. |
|---|---|---|---|---|
| | No. | Type | | |
| a. NON-RCRA HAZARDOUS WASTE, LIQUIDS, (PURGE WATER) | 003 | DM | 450 | P |
| b. | | | | |
| c. | | | | |
| d. EX 4 (WATER) | | | | |

| G. Additional Descriptions for Materials Listed Above  11a.1409730      3X55 | H. Handling Codes for Wastes Listed Above  11/32 |
|---|---|

**15. Special Handling Instructions and Additional Information**

EMERGENCY PHONE #: (800) 483-3718
GENERATOR: May Creek Landfill

**16. GENERATOR'S CERTIFICATION:** I hereby certify that the contents of this shipment are fully and accurately described and are in all respects in proper condition for transport. The materials described on this manifest are not subject to federal hazardous waste regulations.

| Printed/Typed Name  Jacob Cernes | Signature | Date Month 7 Day 29 Year 21 |
|---|---|---|
| **17. Transporter 1 Acknowledgement of Receipt of Materials** | | |
| Printed/Typed Name  Charles Cribs | Signature | Date Month 7 Day 29 Year 21 |
| **18. Transporter 2 Acknowledgement of Receipt of Materials** | | |
| Printed/Typed Name  David Blanchard | Signature | Date Month 7 Day 30 Year 21 |
| **19. Discrepancy Indication Space** | | |
| **20. Facility Owner or Operator:** Certification of receipt of the waste materials covered by this manifest, except as noted in item 19.  702003406 | | |
| Printed/Typed Name | Signature | Date Month 8 Day 10 Year 21 |

NON-HAZARDOUS WASTE

GENERATOR

TRANSPORTER

FACILITY

# What is Compost?

EX 5-h

Gardeners and farmers add compost to soil to improve its physical properties. They may even use compost instead of soil to grow plants. Mature compost is a stable material with a content called humus that is dark brown or black and has a soil-like, earthy smell.

Compost is created by:

- Combining organic wastes, such as wasted food, yard trimmings, and manures, in the right ratios into piles, rows, or vessels.
- Adding bulking agents such as wood chips, as necessary to accelerate the breakdown of organic materials; and
- Allowing the finished material to fully stabilize and mature through a curing process.

Mature compost is created using high temperatures to destroy pathogens and weed seeds that natural decomposition does not destroy.


# Benefits of Composting

There are a number of benefits to compost that not everyone is aware of. Some examples are listed below:

| Additional Information |
|---|
| Find out more about these benefits in the following publications: <br><br> - Innovative Uses of Compost fact sheet series <br> - An Analysis of Composting as an Environmental Remediation Technology |

- Organic waste in landfills generates, methane, a potent greenhouse gas. By composting wasted food and other organics, methane emissions are significantly reduced.
- Compost reduces and in some cases eliminates the need for chemical fertilizers.
- Compost promotes higher yields of agricultural crops.
- Compost can help aid reforestation, wetlands restoration, and habitat revitalization efforts by improving contaminated, compacted, and marginal soils.
- Compost can be used to remediate soils contaminated by hazardous waste in a cost effective manner.
- Compost can capture and destroy 99.6 percent of industrial volatile organic chemicals (VOCs) in contaminated air.

27



# What is compost?

Much of the yard waste and kitchen scraps that we collect and drag to the curb every week can be put to better use as compost. Compost is a rich dark humus, an end product of the natural decomposition of plant and plant products under controlled conditions. Composting is a practical and convenient way to reuse your lawn, garden, and kitchen wastes.

Leaves, grass clippings, fruit and vegetable scraps, crushed eggshells, tea bags, coffee grounds, and even coffee filters are all items that can be used to make compost, while reducing waste in landfills. Compost can be used to enrich flower and vegetable gardens, improve the soil around trees and shrubs, and enhance the soil in houseplants and planter boxes.

Composting is a complex feeding pattern involving hundreds of different organisms, including bacteria, fungi, worms and insects. What remains after these organisms break down organic refuse is the rich compost that nourishes lawns and gardens.

# The benefits of using compost

Homeowners often have difficulty disposing of leaves, grass clippings and other garden refuse. In many states, it is illegal to dump lawn waste in landfills, and disposing of it in strom drains, lakes, rivers and streams clogs drains and pollutes water.

Instead of filling landfills and polluting local waterways with this waste, citizens can benefit from it. Backyard composting of organic waste creates natural soil additives for use on lawns and gardens, and used as potting soil for house plants. These are some other benefits of using compost:

- Improved soil texture
- Increased soil aeration
- Suppressed weed growth
- Improved water absorption
- Decreased soil erosion
- Less need for commercial soil additives
- Helps prevent soil compaction

- Build your compost pile on soft soil or a pile of tree limbs to improve drainage. Boards, chicken wire or other materials can be used to make side frames to help hold the pile together if space is limited.

- Build successive layers of leaves, grass clippings, vegetable scraps, and other green matter. For more rapid decomposition, chop and mix components together.

- Cover layers with 1-2 inches of soil or manure.

- During dry weather, keep the pile moist. In cold winter months, cover the pile with black plastic to insulate and shed excess water.

- Aerate the pile by inserting a vertical pipe.

- Mix compost with a pitchfork after six weeks. This helps aerate the pile, and keeps the bacterial processes from overheating.

## What can you compost?

To achieve the healthiest compost, you will need the right mix of ingredients. Here are some ideas for ingredients to include and those to avoid:

### Stuff to include

- Grass clippings and leaves
- Fruit and vegetable scraps
- Tea bags and coffee grounds
- Fireplace ashes
- Vacuum cleaner lint
- Straw/hat
- Wood chips and sawdust
- Shredded newspaper

### Stuff to avoid

- Diseased plants
- Human and pet waste
- Chemically treated wood products
- Barbecue grill ash
- Meat and fish scraps and bones
- Oils and other fatty food products
- Milk products
- Pernicious weeds



Raw Materials

Organic Matter
(kitchen waste, lawn refuse)
+
Minerals
(soil, manure)
+
Water

Oxygen

Water
Carbon Dioxide
Heat

Microorganisms

Oxygen

Finished Compost

Organic Matter,
Water,
Microorganisms

X 2 20 2 1 22874    DECL OF J. WOOD XH.

10/27/2019        EX 7   JARRON WOOD

# DECLARATION OF JARROD WOOD

THIS DECL. IS MADE UNDER PENALTY OF PERJURY UNDER WA, STATE LAW.

I AM A LONGTIME FRIEND OF CHUCK PILLON AND HAVE VISITED HIS PROPERTY MANY TIMES OVER THE PAST TWENTY YEARS.

I HAVE WATCHED OVER ALL THIS TIME AS HE BUILT UP A SYSTEM OF COMPOST BERMS ON HIS LAND TO ABSORB STORM-WATER. IN ALL THIS TIME I HAVE NEVER SEEN ANYTHING BUT YARD DEBRIS AND WOOD-CHIPS ADDED THERE.

COINCIDENTLY I WAS THERE THE DAY THE EPA DUG INTO THE BIG BERM BEHIND THE HOUSE.

IT QUICKLY BECAME CLEAR WHEN THE E.P.A. DUG CLEAR DOWN 25 FEET IN PLACES THAT THERE WAS NOTHING BUT COMPOST THERE — AND JEFF FOULON FROM THE E.P.A. SAID SO IN MY PRESENCE.

SINCE THEN I HAVE SEEN ABSOLUTELY NO DISTURBANCE TO THAT BERM BY ANYONE — CERTAINLY NOT THE EPA

X Jarrod L. Wood    29

EX 8. -1   RAY COX

July 29th...2023

**Declaration of Raymond Cox.**

**THIS DECLARATION IS MADE UNDER PENALTY UNDER THE LAWS OF THE STATE OF WASHINGTON.**

My name is Raymond Cox. I have lived in Coalfield, King County for many years. I have known Chuck Pillon for nearly all that time. I have visited him at home on countless occasions. I have watched as he has improved his homestead...and created a collection of cars...trucks...boats...heavy equipment...and so on. Chuck...and I and others have also been active in community public safety and environmental activities over the3 years..

Chuck has also composted tons of yard waste and wood scrap on the western side of his land. He has been very careful not to allow anything improper or hazardous into the mix.

Chuck has avoided any odor problems by mixing the compost ...and I have  never smelled anything unpleasant there. And I haven't heard complaints from others. Chuck repairs or scraps old equipment and junk metal too. He lets the homeless people he shelters on his land gather some materials and share the returns.

When we learned that the EPA had been sent to investigate Chuck's land I decided that I was going to keep an eye on the investigation. Chuck had told us what the accusations against him were. As we looked on the EPA set out to prove what the State had told them

We knew that there was no real hazard on his land...and that the water drainage had never polluted anything down stream. I watched directly as the EPA dug around the shop buildings near the house. We heard

30

EX 8-2

that the EPA had suggested it might have to tear those buildings down because they were told that pollution went so deep under them that bigger machines were needed.

I got along fine with the EPA crew and they let me watch as they did the preliminary soil tests in those buildings. They dug about 8-10 inches in several spots there and then tested the soil. To their surprise that found only modest oil-stained-soil...and nothing deeper that the surface soil. At that point they gave up the search and filled these spots and moved on. They hauled off about two truck-loads of dirt that they dug at the start. That was it.

Nearby they made final soil samplings and again just took away some surface soil where some gas or diesel had been spilled years ago. There was no odor exposed anywhere I watched them work. Within the next few days I watched as the EPA loaded up and moved on. To my knowledge the EPA has never returned for anymore investigation of Chuck's land.

I was also aware that another neighbor watched when the EPA dug into the Compost Pile up the hill. In all the time after I never saw any more action there by the EPA. Chuck told me that the EPA had tested there and also found no hazardous material. So they just recorded that fact...and left that site where it was with no further work needed there.


**SIGNED AT RENTON WASHINGTON....JULY 29TH, 2023.**



**RAYMOND COX**

EX 9.

3/5/2019

The Honorable Julia Garrat

# IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

# FOR KING COUNTY.

THE STATE OF WASHINGTON.

        Plaintiff

                Vs.

CHUCK PILLON

        Defendant

NO 16-1-05983-6 KNT

MOTION FOR CANCELLATION OF ~~████████████████████~~
LITTER CLEANUP RESTITUTION.

## MOTION

THE IMPOSITION OF THIS CLEANUP PAYMENT WAS AN EGREGIOUS VIOLATION OF BOTH THE 14TH AND 8TH AMENDMENTS TO BEGIN WITH. THIS FACT IS ALL THE MORE DEMONSTRATED BY THE RECENT U.S. SUPREME COURT RESTATEMENT OF PROHIBITION OF SUCH ABUSE BY GOVERNMENT AGENCIES.

Motion of July 28th 2019
To Cancel Restitution Payment
16-1-05983-6KNT

32

The clear evidence of malfeasance by the State of Washington makes clear the situation must be promptly reversed. The primary predicate for this abuse by the State was the fiction that Defendant has operated an ***alleged illegal landfill***...

...accumulating ***harmful solid waste*** on his property for many years.

The State adopted this fiction from King County...which has for years sought to intimidate Defendant because or his COMPOSTING AND RECYCLING activity. Both these activities are not only lawful...but in fact encouraged by all agencies concerned here.

Over the years Defendant cooperated with King County in allowing free access to inspect this operation until an event in 2012. After years of failure to make a case that this ***alleged landfill*** was anything but a COMPOST PILE...King County became more aggressive and began to enlist other agencies...seeking to overwhelm Defendant.

This harassment continued until the State of WA. became involved in 2016. The State filed charges in the Superior Court. There the State convinced the Court that this COMPOST PILE was "something else";

To Wit: an ***alleged solid waste landfill***. The State relied on photos of trash on and around this COMPOST PILE. No excavations or other tests were done or presented to the Court. Defendant pointed out this long history to the Court to no avail.

Motion of July 28th 2019
To Cancel Restitution Payment
16-1-05983-6KNT

Ironically the U.S.EPA was then employed by the State in an attempt to consolidate the several fictions about circumstances on Defendant's land. The Lead Agent on the EPA crew was Mr. Jeff Fowlow. The first order of business for the EPA was to excavate several areas on this COMPOST PILE...expecting by the EPA's own statement... to locate massive deposits of junk vehicles...old tires...storage tanks...and other improper materials: that is...**_an alleged landfill_** of hazardous material. This is what the State told the EPA in order to convince them to proceed...according to EPA Officials.

HOWEVER...WHEN THE EPA EXCAVATED TO DEPTHS OF 25 FEET IN SEVERAL PLACES...DOWN TO THE ORIGINAL GRADE... THEY DID NOT UNEARTH ANY SUCH MATERIAL...SAVE FOR TWO OLD TIRES AND A METAL TRAILER HITCH...IN OVER 200 YARDS EXCAVATED.

With that...the EPA closed up the excavations and went about their other "work". EPA records...and the available testimony of EPA staff and other witnesses. Thus was the whole malicious fiction of an **_"illegal hazardous waste landfill"_** disproven and put to rest.

Importantly...with respect to the modest amount of trash that was atop the COMPOST PILE...Defendant had carefully disposed of most of it in the period before and immediately after the sentencing phase of the original trial. In fact the State...in the person of AAG Marlow...had been informed of the ongoing cleanup...**_at that time and in an email response to Defendant stated that there was no problem as long as Defendant used a licensed carrier and disposed of the_**

Defendant's property. An illustrative page of that Report is included with thisMotion. In it Walters **_highlights in red  such caveat_**. It is clear then that the testing was at least inconclusive...and could not sustain an argument beyond reasonable doubt. Marlow knew this.

Walters went on to confirm in that June 2016 email exchange that DOE did not

understand the STORMWATER SYSTEM that Defendant has engineered on his

property and THANKED DEFENDANT FOR

THE CLARIFICATION AND INVITATION TO RETURN FOR CERTAIN ADDITIONAL

TESTING...to establish a baseline on water quality from the uphill off-property

sources of stormwater.

When you add the belated ADMISSION in the AAG Ron Lavigne response to

Defendant's 2018 lawsuit ...that Greg Stegman of DOE had also confirmed that

DOE saw no need for return testing at the Defendant's property...you see that the

malice is clear. GREG STEGMAN HAD NOTIFIED MARLOW OF THIS SAME FACT IN A

PRE-TRIAL INTERVIEW THAT DEFENDANT REQUESTED AND ATTENDED. STEGMAN

ADDED IN THAT INTERVIEW THAT THE REASON WAS THAT "THOSE RESULTS WERE

NO BIG DEAL!"

All this fact was recorded in the DOE report as of June 2016. Still Defendant was

charged with these crimes in late August that year. And that DOE report was the

only element of the AGs investigation.

This CLEANUP PAYMENT Order then...was a part of the ongoing

inconsistent...speculative and *__malicious calculation__* on the part of the State. The malice is intrinsically part of a greater malicious prosecution by the State. The

now clear evidence that this prosecution was a result of State suppression of EXCULPATORY EVIDENCE is indelible.  This evidence derives again *__from State admissions__* in response to that lawsuit filed by Defendant... (18-2-24755-1 KNT).

When this CLEANUP PAYMENT was calculated in August 2018 AAG Marlow knew that the State DOE had Never tested any material in the *__alleged LANDFILL__* withdrawn from this situation noting to Defendant that all water and soil testing would thenceforth be conducted by the U.S.EPA. And no such testing of the *__alleged LANDFILL__*" had been done by EPA at that time.

And it bears repeating that when EPA did those excavations months later IN NOVEMBER that year they immediately noted that there was no hazardous material in that alleged *__LANDFILL__*...ONLY SOIL. And SOIL cannot be considered hazardous material.

CLEARLY AAG MARLOW HAD NO BASIS TO EVEN BEGIN ANY CALCULATION!

This must now be recognized by the Court for the facts thus confirmed... (*__Admitted__*...the State's own word). The appropriate portions of the lawsuit will be appended to this Motion. Further passages from the State's own Memorandum in this matter will illustrate how speculative and arbitrary this calculation actually is.

Motion of July 28th 2019
To Cancel Restitution Payment
16-1-05983-6KNT

I trust the Court here understands and applies this timely restatement of principle by the SUPREME COURT. AND ACCORDINGLY REMOVES THIS SPURIOUS BURDEN FROM DEFENDANT.

THIS PLEADING IS MADE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON.

AT RENTON WA,,,MARCH 5TH 2019

..........................................................................

CHUCK PILLON

Motion of July 28th 2019
To Cancel Restitution Payment
16-1-05983-6KNT



"The Eighth Amendment's Excessive Fines Clause is an incorporated protection applicable to the States under the Fourteenth Amendment's Due Process (https://constitutioncenter.org/interactive-constitution/amendments/amendment-xiv/common-interpretation-due-process-clause-of-the-fourteenth-amendment/clause/12) Clause," Ginsburg said. Justice Clarence Thomas and Neil Gorsuch agreed with the main ruling, but they said the 14th Amendment's Privileges or Immunities (https://constitutioncenter.org/interactive-constitution/amendments/amendment-xiv/the-privileges-or-immunities-clause-by-akhil-amar-and-john-harrison/clause/55) Clause was the controlling factor in the case.

Tyson Timbs filed the lawsuit after he was convicted in a controlled substance and theft case. The state of Indiana wanted to seize Timbs' Land Rover under its civil forfeiture laws, arguing it was used to commit a crime. But the Land Rover was valued at $42,000, much more than the $10,000 fine allowed under his drug conviction.

Timbs' attorneys argued Indiana's actions violated the Excessive Fines Clause in the Constitution's Eighth Amendment. After Timbs won his first legal battle, the Indiana Supreme Court said  the Excessive Fines Clause didn't apply to individual states when they acted. Timbs' appeal to the United States Supreme Court was only about the incorporation of the Excessive Fines Clause at the state level, and not its application to civil forfeiture cases.

"The historical and logical case for concluding that the Fourteenth Amendment incorporates the Excessive Fines Clause is indeed overwhelming," Ginsburg said. She also didn't agree with Indiana's argument that the nature of the case as a civil forfeiture mattered. "The Excessive Fines Clause is thus incorporated regardless of whether application of the Clause to civil *in rem* forfeitures is itself fundamental or deeply rooted," she concluded.

Justice Gorsuch believed the question really involved a different part of the 14th Amendment. "As an original matter, I acknowledge, the appropriate vehicle for incorporation may well be the Fourteenth Amendment's Privileges or Immunities Clause, rather than, as this Court has long assumed, the Due Process Clause," he said. Justice Thomas had similar thoughts. "I would hold that the right to be free from excessive fines is one of the 'privileges or immunities of citizens of the United States' protected by the Fourteenth Amendment," he wrote.

*Scott Bomboy is the editor and chief of the National Constitution Center.*

Filed Under: 14th Amendment (/blog/filter/14th-amendment), Eighth Amendment (/blog/filter/eighth-amendment), Supreme Court (/blog/filter/supreme-court), Article III, Section 1 (/blog/filter/article-iii-section-1), 14th Amendment Due Process Clause (/blog/filter/14th-amendment-due-process-clause)

38



EX 11 AERIAL

Workshop Area

Residential Area

Bus/RV Area

Landfill Area

"LAND FILL"
AKA DEBRIS FIELD

Source: ©2016 Microsoft Corporation (Bing).

bing

ecology and environment, inc.
Global Environmental Specialists
Seattle, Washington

MAY CREEK LANDFILL
Renton, Washington

| 100 | 50 | 0 | 100 Feet |

Figure 2
SITE WORK AREAS

| Date: | Drawn by: | |
| 7/14/16 | AES | ID:START.TV16/20007/fig 2 |

39

EX-12    (CAVE)

# IN THE MATTER OF THE CHARGES AGAINST CHUCK PILLON IN KING COUNTY SUPERIOR COURT 16-1-05983-6KNT

# DECLARATION OF CLINT CAVE OF COALFIELD/MAY VALLEY WA.

I have lived in Coalfield for 16 years. I first met Chuck in 2004 when he had organized an effort to clean out debris from a drainage ditch that was flooding our properties. There were about 25 volunteers and we were able to clean it up in two days and get the water flowing again.

Chuck and I have an interest in old cars. He collects them and enjoys them because they bring back memories for both of us that we discuss from time to time. Other friends join us now and then. Chuck is very generous with old parts and friends often find what they need in his collection. We occasionally make trades but he does not charge for these parts...especially to the down and out people who come around. We also trade ideas on car repairs which we both enjoy.

Chuck is constantly in touch with the local cops. When we had a rash of burglaries in the neighborhood he was able to help with time and guidance. He encouraged many neighbors to be more vigilant and look out for one another.

Recently I got information about a neighbors stolen car. Chuck and I went "hunting" at places he knew some of the local thieves hung-out. Sure enough we located the stolen truck amd maintained a vigil until Renton PD responded. They not only recovered that truck...but two other stolen vehicles as well.

This led to information that tied to a local drug-house that we neighbors were also watching with Chuck. It was one of several. Chuck served an abatement on this place...and we were also able to shut down a companion drughouse in the process. It was right next door to my place and I and other neighbors had suffered a lot of theft and burglary while it ran on.

Since then we have had no problems from either place. Chuck followed up on more evidence and contacted Bellevue Police about some burglaries that these thieves had done there too. That got them some jail time...and now that they are back we will continue to be vigilant. We hear that one of the ringleaders has actually straightened himself out and is actually holding down a job. That was more than we hoped for. It is a good thing.

I consider Chuck to be a good friend...and I know others respect him as well.

AT RENTON WA.   NOVEMBER   ,2017.



40

2

December 1, 2017

EX. 13

To the Honorable Court:

From 2006 through 2013, I was King County's land-use ombudsman. In that position, I had many, many interactions with Chuck Pillon. At some point earlier this year, Mr. Pillon sought to subpoena me as witness in his trial. I had and have no qualms about testifying, but as I understand it, Mr. Pillon and the PAO decided that it would be more efficient for me to put my recollections in writing, and then let the court decide admissibility. I write in my *personal* capacity. My observations and recollections do not in any way represent the position of King County or any of its agencies.

I know very little about the current case against Mr. Pillon for two reasons. First, since 2013 I have been serving as the County's Hearing Examiner, and in that quasi-judicial position I endeavor to limit my focus to the information presented to me, on the record, in the cases that come before me, at least for information related to the types of disputes—such as environmental and land use—I have jurisdiction over. And second, in numerous instances where Mr. Pillon sought my help as an ombudsman, and in all the times I interacted with him out in the community, almost none of the issues he raised involved his own property and I never visited his property, property which I understand is the focus of the current litigation.

Instead, when Mr. Pillon sought my assistance as an ombudsman, his focus was almost always on his vision of the public good. Sometimes it was what he saw as overzealous County code enforcement of other property owners. Other times it was what he saw as the Sheriff's underzealous efforts to abate drug houses in the community. Another time it involved what he saw as the negative impacts on residents when those residents were forced to relocate due to a County project. But the bulk of my work with Mr. Pillon involved his tireless efforts in support of river safety, especially as it related to his complaints that the County was passively not protecting river users from naturally occurring obstructions and was actively endangering river users by placing its own engineered large woody debris installations in navigable waters.

Sometimes I disagreed with the merits of Mr. Pillon's position, but other times his complaints were objectively correct. For example, when the responsible County agency was designing large wood installations, that agency was (at least while I was ombudsman) repeatedly ignoring the controlling ordinance's requirement that the greatest safety for river users be "of primary consideration," and he tirelessly kept such safety issues on my front burner. Regardless of whether or not I eventually sided with him, his complaints were always in good faith and he always conducted himself with respect for me and for the agency employees we interacted with. It was a real pleasure to work with him.

The above may or may not be admissible in his current case—the court can assuredly decide that for itself—but I give it freely, without editorial influence from either party. And I declare, under penalty of perjury under the laws of the State of Washington, that the above is true and correct.

Offered this December 1, 2017,
Seattle, Washington

David W. Spohr

41

EX 14

# IN THE MATTER OF THE CHARGES AGAINST CHUCK PILLON IN KING COUNTY SUPERIOR COURT 16-1-05983-6KNT

## DECLARATION OF WA. KEN OSBORNE

I am a resident of Coalfield in May Valley. I have been a friend of Chuck Pillon for nearly 25 years. In this time I have visited his homestead on countless occasions. We share a sort of charitable commitment with others out here to take community care of our less fortunate "homeless neighbors." That included "housing" some of them on our properties and trying to help them rehabilitate themselves. We clean-up suitable RVs and shelter them if they are literally without any otherwe can for them

Some of the support Chuck provides is a place where these unfortunates can do meager recycling of metals and other scrap. I regularly provide modest chores and recyclable resources for two of the homeless that live with Chuck. My "primary service" over the years was to house seriously socially-handicapped people in conjunction with the Department of Social and Health Services.

The accusation that there is any danger to the public or the environment on his property is in my direct experience utterly groundless. There is no odor...no foul water...and no unsightly accumilation that is any way offensive to the public because his property is completely secluded.

The allegation about an illegal wrecking yard is also ridiculous. Like many of us older guys, Chuck has a keen interest in the vehicles and machinery of our younger years. Over the years he has built up quite a collection...and several of us enjoy "horse-trading" this sort of "Americana" as an inexpensive pastime. I know Chuck gives some parts and used tires away to anyone in need, but I have never seen him take any money from these unfortunates for them.

It is also common to see automotive trash left in Chuck's driveway for disposal because he has put "friendly pressure" on those who might otherwise dump them along our roads and public areas.

The work Chuck has done about drug-problems in our community is also well respected and I know he has spent many hours doing so.

At Renton WA. Feb 15th 2018

42

EX 15-1

## THIS DECLARATION IS MADE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WA.

**STATEMENT by Denis Law regarding Chuck Pillon**

**(I'm scheduled to be out of town this month and unavailable to be present to testify at a hearing)**

My name is Denis Law and I have been serving as the mayor of the city of Renton since January, 2008. I have known Chuck Pillon for many years, dating back to early in my career in the publishing business when I regularly covered the Seattle Police Department, especially in the south part of the city where Chuck was serving as a patrol sergeant.

There were several years when I lost track of Chuck after selling our publishing company in 1990. In 1994, I started another publishing company in Renton and over the next several years, I became reacquainted with Chuck. This was prior to my involvement in local government.

There were several "hot spots" in Renton where police were continually called to address illegal activity, from assaults and thefts, to suspected drug dealing and other crimes. We covered a number of these incidents in the newspaper that I started in the community.

During his time with Seattle Police, Chuck successfully introduced innovative enforcement practices to address ongoing criminal activity at rental houses, motels and other properties, which ultimately included nuisance abatement of the property. In Rainier Valley, there were a number of situations where neighborhoods were under seize by drug dealers operating out of rental properties, which included gunfire and other illegal activity that had a tremendous impact on the community. Many of these properties were successfully shut down through the abatement process, restoring peace to the neighborhoods.

In Renton, Chuck and one of his longtime partners, Frank LaChance, employed similar tactics in identifying locations where there were ongoing criminal activities impacting neighborhoods. They introduced the idea of nuisance abatement to the community and to the owners of properties where illegal activity was taking place. In a number of cases, they were successful at resolving the issues associated with those properties.

Renton inherited a number of neighborhoods through annexation from King County where storm water retention ponds were not properly fenced. Following a near drowning, Chuck became a strong voice for identifying dangerous ponds in the community, which since, have all been properly fenced to avoid a potential tragedy.

Chuck has also been a strong and vocal advocate for public safety as it pertains to the Cedar River for many years, both for concerns over the safety of children using the



EX 15-2

river, and also the potential of damage to city infrastructure due to county policies over the gathering of woody debris in the river.

King County at one point in time, had a practice of chaining large logs together as part of their effort to restore fish habitat along the river shores. This practice caused a serious situation for the city of Renton when the chained logs broke free during a significant storm and wrapped around a bridge support, endangering the structure. Another large pile of woody debris was pushed toward the center of the city where it became entangled against a bridge, which caused serious concern for the bridge and also a major natural gas line that runs along the bridge span. The county eliminated the practice of chaining logs together, but continues policies that encourage the gathering of tons of woody debris along the river banks. Chuck continues to address his concerns over county practices with the King County Sheriff's Department, which has jurisdiction over the river, as well as county officials.

In summary, I want to say that I have known Chuck for many years and during all of this time, he has been a tireless advocate for helping the public in many ways. While he's never been strong at accepting process that is inherent in government, his goal of making it better for the general public has never been questionable.

Denis Law                                         Date: May 1, 2017





Subject:  To

From:  andypillo@hotmail.com
  To:  chuckpillon@yahoo.com
Date:  Tuesday, September 11, 2018 05:20:02 PM PDT

To Whom It May Concern at King County Superior Court:

In August of 1977 my father (Check Pillon) began pouring the foundation to his home at 15753 Renton Issaquah Rd. Renton, WA 98058. I had over time since he had purchased the property helped with clearing the home site and prepping for the foundation pour. once the foundation area was excavated and the foundation formed up fall rains came and the site began flooding and water ran down the drive and across Renton-Issaquah Hwy (WA State route 900).

The flooding from rain persisted and the following year my father began bringing wood chips from tree services to control the run off. He continued to bring in tree service chips and yard waste over the years and this stopped almost all of the water flow across the property except for a drainage ditch along the drive which he controls. Over the years I have on occasion helped spread the tree service chips and yard waste and have never seen any unsuitable or toxic materials mixed into the materials.

Also note, my father has always been a collector of old vehicles and machinery as far back as I can remember.

Best Regards,

Lawrence A. Pillon





45



Douglas Bandelin
17702 se May Valley rd
Renton Wa. 98059

To the court          EX 17-1
Judgeing Chuck Pillon
2017-2018

Dear Sirs:

My name is Douglas Glenn Bandelin and I have been a king
county resident/property owner since 1978. My occupation for
the last thirty years of gainful employment was as an
independent Insurance fraud investigator. [one of the cases I
worked on Cox vs. mutual of Enumclaw which went to the
state supreme court where my work prevailed and insurance
law was changed] I am writing to you about my friend and
neighbor Charles (chuck) Pillon of May Valley.

I have known Mr. Pillon for over 20 years. During that time I
have seen him actively serve and protect his fellow citizens on
several occasions. I have been with him when people have
come to him for advice about what to do with public nuisances
of both a criminal or civil nature.

In my presence I have never noticed Chuck to be hot headed.
He is always quick to listen, slow to condemn, and dispenses
sound advice to those who ask him for it. I have never seen him
be vindictive. In fact his capacity of forgiveness and to see the
good in people, even those who have transgressed against him
personally, seems boundless.

Now as to the States Attorney Generals charge (see Seattle
Times Sep. 9, 2016) that Mr. Pillon's landfill put the states
natural resources in "imminent danger of harm." I am shocked.

EX-7    ETO) 46

EX 17-2

I have been to Mr. Pillon's place many times; his ten acres may not be pretty to the eye but it hardly qualifies as an "imminent danger." My goodness imminent danger would be the Seattle storm sewage system that dumps raw sewage into Puget sound every rain storm or the intentional clogging of creeks and rivers with large woody debris which not only exacerbate flooding but directly have been responsible of great harm to human life or the accidental release of thousands of gallons of diesel from the king county bus barn and so on.

In short, Mr. Pillon, in my estimation is only guilty of a zeal to be of service to his neighbors and the state. I would hate to live in a world where men such as Charles Pillon were silenced and made impotent.

Respectively,

Douglas Bandelin
Nov 14, 2017

47

EX 2   (10)